KELLEY, GLOVER & VALE, INC., ET AL. *v*. HEITMAN.

[No. 27,734.   Filed December 1, 1942.   Rehearing denied January 11, 1943.]

626

*Walter Myers, Donald L. Smith,* and *Walter Myers, Jr.,* all of Indianapolis, and *Jay E. Darlington,* of Hammond, for appellants.

*Sheehan & Lyddick, John W. Lyddick,* and *Alex C. Pendleton,* all of Gary, for appellee.

SHAKE, J.—This action was on a promissory note and for the foreclosure and sale of collateral pledged therewith. The note was given by the appellants to the First National Bank of Gary of which the appellee is receiver. The appellants answered that there was a failure of consideration and that the transaction was *ultra vires.* The trial court made a special finding of facts and stated conclusions of law favorable to the appellee upon which errors are assigned.

The trial court found that the appellant Kelley, Glover & Vale, Inc. was an Indiana corporation with $100,000 of preferred stock outstanding in the hands of the public; that the Kelley, Glover & Vale Realty Company was organized as a holding company for the aforesaid corporation; and that the individual appellants Kelley, Glover, and Vale were the officers and principal stockholders of both corporations. At and prior to the time of the execution of the note sued on, Kelley, Glover & Vale Realty Company held title to certain real estate which was encumbered with a mortgage given by a former owner to secure the payment of an $85,000 issue of outstanding real estate bonds. In February, 1930, the appellants Kelley and Glover went to the First National Bank of Gary in an endeavor to refinance said mortgage which would be due on March 10, 1930. A verbal understanding was reached with the president of the bank by which said bank, in order to earn a commission, undertook to acquire said bonds and find someone to refinance said loan. Kelley and Glover proposed that Kelley, Glover & Vale, Inc. would procure Kelley, Glover & Vale Realty Company to execute a new mortgage to the lender. The Gary bank, thereupon, purchased with its own funds the outstanding bonds

which were in the hands of one of its competitors, but it failed to find a lender who would refinance the loan. Subsequently, in order to obtain commercial paper to replace said bonds which were carried as cash items in the bank, it prepared notes aggregating $85,000 and represented to the appellants that it was in the process of obtaining a new mortgage loan pursuant to the understanding of the parties and that such notes were desired as a part of the mechanics of such refinancing and would be retired from the proceeds of the new loan. Relying upon these representations, the appellant Kelley signed said notes, all of which recited that the bonds theretofore acquired by the bank, together with other securities, were deposited as collateral. During the course of several renewals of said collateral notes one of them, in the sum of $35,000, was, at the request of the bank, signed by all of the appellants, who likewise relied upon the aforesaid representations. Before the failure of the bank in January, 1932, $12,726.01 in principal and interest had been paid on said note by the appellant Kelley, Glover & Vale, Inc. No resolution was ever adopted by the board of directors of Kelley, Glover & Vale, Inc., authorizing the execution of the note sued on, although a by-law so required. The appellant Kelley wrote a letter to the bank in May, 1930, advising it that he considered the note which he had signed individually and as president of Kelley, Glover & Vale, Inc. a "company matter" and that he had not listed it in his financial statement.

Under the issues the burden was on the appellants to establish that there was a failure of consideration or that the transaction that resulted in the execution of the note was *ultra vires*. *Kinder* v. *Fishers National Bank* (1931), 93 Ind. App. 213, 177 N. E. 904. *McCarthy* v. *Miller, Admr.* (1938), 213 Ind.

596, 12 N. E. (2d) 348. Nothing can be added to a special finding by way of inference, presumption, or intendment; and the omission of a material fact from the special finding is deemed a failure of proof as to such fact and amounts to a finding against the party having the burden of proof thereon. *Rankin* v. *McCollister* (1911), 175 Ind. 387, 93 N. E. 209. However, where the primary facts found lead to but one conclusion or where such facts are of such a character that they necessitate the inference of an ultimate fact, such ultimate fact will be treated as found by the trial court and sufficient on appeal. In such instances, the facts are sufficiently found though there may be a technical defect of statement in the finding. In determining whether conclusions of law are supported by a special finding of facts, it is necessary to bear in mind the rule that a special finding, like a special verdict, a series of instructions, or the like, must be considered as a whole and it cannot be dissected into fragmentary parts and successfully assailed in detail. One part may be considered in connection with other connected parts, or parts referring to the same transaction, and if, taken as a whole, the finding legitimately supports the judgment, it will be upheld. And in determining whether the judgment is thus supported all intendments or presumptions are in favor of the finding rather than against it. *National Surety Co.* v. *State* (1914), 181 Ind. 54, 103 N. E. 105. *Lindley* v. *Seward* (1937), 103 Ind. App. 600, 5 N. E. (2d) 998, 8 N. E. (2d) 119. Mere matters of evidence tending to establish ultimate facts must be disregarded. 2 Watson's Works Practice § 1593.

The trial court did not directly or specifically find a failure of consideration or that execution of the note

was beyond the powers of the officers who purported to bind the corporate maker. This must be construed as a finding against the appellants as to these issues unless the primary facts which the court did find compel the ultimate facts upon which the appellants must rely to defeat the judgment.

In support of their contention that there was, in legal effect, a finding of failure of consideration the appellants rely upon the following facts found by the court: (1) that the bank obtained the appellants' signatures to the note by representations that it was in the process of obtaining a new mortgage loan, that the note was merely a part of the mechanics of obtaining such loan, and that the note would be retired out of the proceeds of such loan, upon which said representations the appellants at all times relied; (2) that the bank failed to perform its obligation to procure a lender who would refinance the mortgage debt; and (3) that none of the appellants received any money for signing the note in question. The fact that the appellants received no money for signing the note is indecisive. A monetary consideration is not essential to a binding contract; it is sufficient if there is a benefit to the promisor or a detriment to the promisee. *Trackwell, Admr.* v. *Irvin* (1917), 66 Ind. App. 5, 115 N. E. 807.

To determine whether the facts found amounted to a finding of failure of consideration, it is necessary to bear in mind the nature and character of the defense. An answer of failure of consideration implies that there was initially a sufficient consideration for the contract. *Shirk* v. *Neible* (1901), 156 Ind. 66, 59 N. E. 281, 83 Am. St. Rep. 150. Complete failure of consideration, as distinguished from a partial failure, discharges the promisor from his obligation. 7 Am. Jur., Bills and Notes, § 252, p. 949. It

follows that one who relies upon a breach of an executory contract as constituting a complete failure of consideration must establish that such executory agreement constituted the entire consideration. *Garriott's Executor* v. *Abbott* (1867), 28 Ind. 9. *Medcalf* v. *Brown* (1881), 77 Ind. 476. Since the appellants rely upon the primary facts found by the court rather than upon a specific finding of the ultimate fact in issue, it is essential that it appear from the findings that the executory contract alleged to have been breached by the bank was the sole consideration for which the note was given. There is no finding to that effect. The special findings do disclose that the appellants executed the note in reliance upon the representations of the bank, but it does not follow that these representations constituted the sole consideration for the note. In other words, the reasons that prompted the appellants to execute the note do not negative the possibility of other considerations. 17 C. J. S., Contracts, § 93, p. 439. If the issue had been lack of consideration or fraud, we would have had a different problem.

The note sued on recited a deposit as collateral security of a part of the bonds covered by the mortgage on the property of the realty company. These bonds were acquired by the bank with its own funds from the Commercial Trust Company. Manifestly, the appellants could not use the bank's assets as collateral for their debt to it. The pledge of the collateral would, therefore, seem to force the inference that the appellants acquired the bonds by purchase from the bank. If so, there was an independent consideration for the note. Their voluntary payment of more than $12,000 on the principal and interest also indicates that the appellants did not regard the sole consideration of the note to be the bank's promise to

repay the obligation out of the proceeds of a new loan to be negotiated by it. The omission of the trial court to find a failure of consideration must be treated as a determination of that issue against the appellants.

The appellants' claim of *ultra vires* is based upon two propositions; namely, that the note in suit was not given for any debt of the appellant Kelley, Glover & Vale, Inc. and that the execution of the note was not authorized by a resolution of its board of directors as required by its by-laws. There was no specific finding of *ultra vires* and again we are asked to infer this fact from the primary facts.

It is true, as the appellants suggest, that title to the real estate which was encumbered to secure the mortgage bonds acquired by the bank was in the Kelley, Glover & Vale Realty Company; but the findings also disclose that the realty company was organized as a holding company to facilitate the business of the appellant company. Ordinarily, a holding company is understood to mean a super-corporation which owns or at least controls such a dominant interest in one or more other corporations that it is enabled to dictate their policies through voting power, or which is in position to control or materially to influence the management of one or more companies by virtue, in part at least, of its ownership of securities in the other company or companies. *Cities Service Co.* v. *Koeneke* (1933), 137 Kan. 7, 20 P. (2d) 460, 87 A. L. R. 16. Kelley, Glover & Vale Realty Company was not a holding company in this sense. We construe the finding to mean that the realty company held property for the use and benefit of the appellant company. "A subsidiary or auxiliary corporation which is created by a parent corporation merely as an agency for the latter may sometimes be regarded as identical with the parent cor-

poration, especially if the stockholders or officers of the two corporations are substantially the same or their systems of operation unified." 13 Am. Jur., Corporations, § 8, p. 162. On that view, Kelley, Glover & Vale, Inc. had such an interest in the assets of Kelley, Glover & Vale Realty Company as would warrant the former in lending its credit to save assets held in the name of the other.

The contention that the note is void because of a by-law of the appellant corporation, which required a resolution of its board of directors to authorize the execution of an obligation on its behalf, does not call for any extended consideration. Persons who are not members or officers of a corporation are not affected in any of their rights by corporate by-laws of which they have no notice. 13 Am. Jur., Corporations, § 161, p. 290.

The judgment is affirmed.

Swaim, J., concurs in result.

Roll, J., dissents with opinion.

## DISSENTING OPINION.

ROLL, J.—This action was brought by appellee receiver against the appellants on a promissory note. A copy of the note was made an exhibit to the complaint. Appellants filed affirmative answers in which they admit the signing of the instrument sued upon, but alleged that said note was executed pursuant to a certain agreement which they set out in their second and third paragraphs of answer. This agreement, with its background, as set forth in appellant's answer, was in substance as follows:

Kelley, Glover & Vale Realty Company owned a certain piece of real estate known as 860 Broadway, Gary,

Indiana. This real estate was encumbered with a mortgage of $85,000, executed by a former owner of said real estate. The mortgage was given to secure an $85,000 bond issue, and the Commercial Trust Company of Gary, Indiana, was named the trustee of said bonds. Said bonds were to mature on March 10, 1930. In early February of 1930, J. J. Kelley and W. J. Glover, Jr., two of the appellants herein, went to the First National Bank of Gary, Indiana, and talked to the president of said bank, Richard Schaaf, and Earnest C. Simpson, the cashier of said bank, about refinancing said mortgage. In this conversation, it was agreed that the First National Bank would purchase from the Commercial Trust Company, trustee of said bonds, all of the said bonds and that said bank, the First National Bank of Gary, would then secure a new money lender who would take a new mortgage of said real estate, and by so doing the First National Bank would receive the regular commission from the new lender for placing the loan, and would obtain said business from its competitor, the Commercial Trust Company. In pursuance to this oral agreement, the First National Bank did purchase from the Commercial Trust Company, trustee, said $85,000 in bonds, and placed the same in the cash drawer of said bank, and listed them as a cash item. Said bank made efforts to secure a new money lender who would put up the money and take a new mortgage from Kelley, Glover & Vale Realty Company, the owner of said real estate. Afterwards, the bank encountered difficulty in finding someone who would lend money on this real estate and take a mortgage on said real estate as security. This being the situation, said bank called Mr. Kelley and told him that they were having difficulty in securing a money lender and the bank needed a note for $85,000, executed by him to be used by said bank

as a part of the mechanics in securing the new money lender, and that said note would be used for that purpose and that purpose only; and as soon as they secured a new loan, they would cancel the $85,000 of bonds which they had theretofore purchased, and would cancel the note. Upon this agreement the note was prepared by the bank and signed by Mr. Kelley, individually. The note provided that the $85,000 in bonds should be collateral security for the payment of said note. The original note so signed by Kelley is identical in form to the note sued upon herein, except as to date and amount and the signatures to said note which will be hereinafter explained.

Said note was renewed from time to time, and said bank closed its doors to business without ever having secured a new loan. When the receiver took charge of said bank, the note and bonds were among the assets of said bank. The signatures to the present note were Kelley, Glover & Vale, Inc., J. J. Kelley, W. J. Glover, and Milo F. Vale, who signed said note on the back as endorsers. There was a request for special finding of fact and conclusion of law. The court, in its special findings of fact, found the facts substantially as above set forth. Finding No. 8 is here copied in full:

"The court finds that in February, 1930, Kelley, Glover-Vale Realty Company held title to a piece of real estate commonly known as 860 Broadway, Gary, Indiana, upon which there was a mortgage for $85,000.00, evidenced by bonds signed by the prior owner, Leslie I. Combs, and which bonds and mortgage were to mature March 10, 1930, and that at that time none of the defendants were personally obligated to pay the said bonds or mortgage; that the defendants desired to refinance said mortgage; and that early in February, 1930, the defendants J. J. Kelley and William J. Glover went into the First National Bank of Gary, Indiana, in an endeavor to refinance said mortgage and prevent a

foreclosure thereof. At said time J. J. Kelley and William J. Glover, acting on behalf of Kelley, Glover & Vale, Inc., had a conversation with Richard Schaaf, the President of said Bank, during which conversation an oral understanding was made between Kelley, Glover & Vale, Inc., speaking through said Kelley, and Glover on the one hand, and the said bank on the other hand speaking through said Schaaf, the terms of which were and are as follows:

"The bank was to call in said $85,000.00 of bonds, which had not yet matured, but would mature the next month, from the Trustee, the Commercial Trust Company. Said bank would procure a new money lender, who would make a new mortgage loan upon said real estate. Kelley, Glover-Vale, Inc., would then have said new mortgage executed by the owner of the real estate, Kelley, Glover-Vale Realty Company. The bank would take from the new lender the proceeds of said new mortgage in payment and discharge of the old bonds, which it would take up. The bank would earn a commission for obtaining the new loan and would obtain the advantage of getting this business away from its competitor and business rival, Commercial Trust Company, which held the maturing bonds.

"Pursuant to said understanding the bank called in and paid for said $85,000.00 of bonds with its own money. It failed, however, to procure a new money lender who would make the aforesaid loan. It never procured a new mortgage loan. Kelley, Glover & Vale, Inc., was always ready to carry out its part of said understanding.

"Subsequent to the making of said oral understanding and after the bank had called in said bonds as aforesaid, the bank, having used its own money to call in said bonds, was obliged to and did put said bonds in its cash drawer and carry same on its books as a cash asset in order to make up for the cash which it had paid out.

"In order to obtain some commercial paper to place among its assets to take the place of said $85,000.00 of bonds, the bank obtained $85,000.00 of notes (equal to the amount of the bonds) in the following manner and under the following conditions: On its own initiative, it prepared a $50,000.00 note ready for the signature of Kelley, Glover &

Vale, Inc., payable to the bank and reciting that $50,000.00 of said notes were collateral on the note. The bank induced said J. J. Kelley to sign said note as President of said corporation by the means and under the conditions hereafter stated.

"Shortly after obtaining said $50,000.00 note, the bank likewise prepared and induced J. J. Kelley to sign a series of three notes of himself personally to the bank, totalling $35,000.00, which notes were subsequently consolidated by renewal, into one $35,000.00 note signed by Kelley personally to the bank. This $35,000.00 note of Kelley, which was prepared by the bank for his signature, recited that $35,000.00 of said bonds were collateral to the note."

"The bank obtained the signature of said Kelley as President of Kelley, Glover & Vale, Inc., upon the $50,000.00 note, and also obtained the signature of Kelley individually upon the $35,000.00 of note by the following means:

"T. M. Kitchen, assistant cashier of the bank stated to Kelley: that the bank was in process of obtaining the new mortgage loan under its aforesaid understanding, and stated to him that it desired his signature on said notes merely as part of the mechanics of obtaining said mortgage; that when the proceeds of the new mortgage were obtained, the bank would use same to liquidate said $85,000.00 of bonds, which it held, and at the same time the bank would cancel the notes; and that the notes were *to be paid solely out of the proceeds to be derived from the new mortgage and not otherwise.* Relying upon said statement of the bank through said assistant cashier, Kelley signed said notes solely with the intent and for the purpose aforesaid."

"After obtaining said notes, the bank continued its efforts to obtain the new mortgage loan, down to the time the bank closed in January, 1932, but the bank never did procure said loan or carry out its part of the aforesaid understanding. Continually, down to the time the bank closed, Kelley, Glover & Vale, Inc., and the other defendants continued to rely upon the bank's said understanding to procure the new mortgage loan and, so relying, they did

from time to time renew said notes at the request of the bank."

"On April 4, 1931, the bank assigned and endorsed the $50,000.00 note to the Gary First National Corporation, which had the same president as the Bank, Richard Schaaf, and which then had its office in the bank's quarters."

"The bank continued to carry the $35,000.00 note of Kelley, and renewals thereof, until July 7, 1931, when the bank made an entry on its books showing that this Kelley note was paid and discharged by renewal. In fact, Kelley paid nothing in discharge of the note. The bank, on its own initiative at that time, prepared a note of like amount to itself to be signed by Kelley, Glover & Vale, Inc., and presented same to Kelley for signature as its president, which he signed solely with the understanding above stated. The bank then placed this note of Kelley, Glover & Vale, Inc., among its assets in place of the note of Kelley. Kelley, Glover & Vale, Inc., received no money from the bank for the signing of this additional note. None of the defendants received any money for signing any of the notes mentioned in these findings."

"This last mentioned note was renewed from time to time solely for the reasons aforesaid, and the last renewal which was made shortly before the bank closed, is the note sued upon. During the course of said renewals the bank requested, and obtained, the signature of the defendants J. J. Kelley, William J. Glover, Jr., and Milo F. Vale, as purported endorsers on the back of said note. Said endorsements as well as all of said renewals including the last renewal, were solely in reliance upon the aforesaid oral understanding of the bank, and in reliance upon the aforesaid oral understanding of the bank and in reliance upon the aforesaid representations of the bank through said assistant cashier, as to the purposes and manner of payment of the note. All payments of principal and interest mentioned in these findings were likewise made solely upon such reliance. Defendant Kelley, Glover & Vale, Inc., was at all times ready to perform its part of said understanding but said bank failed to perform its part as aforesaid, and it closed in Janu-

ary, 1932 without having performed its part. Neither did its Receiver ever perform subsequent to closing." (Our italics.)

We think this finding very clearly sets forth the substance of this law suit. Before discussing the effect of finding No. 8, we would like to state, that while it is true as set forth in the majority opinion, the pleader does allege in his second and third paragraphs of answer that there was a failure of consideration for said note, it is also to be noted that in said answers the pleader also alleges that there was no consideration for said note, but the fact remains that whatever the pleader chose to call the answer, the facts constituting his defense is set out in full. The facts pleaded determine the character of the pleading and not what the pleader might correctly or erroneously designate the pleading. We think this proposition is so fundamental and so familiar to the profession that we need not take time nor space to cite authority to this proposition.

In appellants' second paragraph of answer it is alleged in substance that after First National Bank, appellee bank, had purchased of the Commercial Trust Company, trustee, the $85,000.00 of bonds, said bank agreed to secure a new money lender and the proceedings of said loan would be turned over to said bank in payment and discharge of the bonds purchased by the bank, and also be used to discharge said note, and that said bank would not require payment of said note until said new loan was consummated. In other words, said second paragraph of answer alleges that by the agreement it was understood between the parties that the signers of said note were not to incur any personal liability, and would not be called upon by the bank to pay said note, but that said note should be paid out of

the new loan that was to be obtained by the bank, and the note thus discharged in that manner. It will be noted also, that by finding No. 8 the court specifically found that the oral contract alleged and set up in said second paragraph of answer was in fact made, and found the terms of said contract to be as alleged in said answer.

Before expressing my views on the law, let us keep in mind all the facts pleaded; and I wish to emphasize the following language found in said finding No. 8:

> "That when the proceeds of the new mortgage were obtained, the bank would use same to liquidate said $85,000.00 of bonds, which it held, and at the same time the bank would cancel the notes; and that *the notes were to be paid solely out of the proceeds to be derived from the new mortgage and not otherwise."* (Our italics.)

Further on in the finding, the court found the following:

> "This last mentioned note was renewed from time to time solely for the reasons aforesaid, and the last renewal which was made shortly before the bank closed, is the note sued upon. During the course of said renewals the bank requested, and obtained, the signature of the defendants J. J. Kelley, William J. Glover, Jr., and Milo F. Vale, as purported endorsers on the back of said note. Said endorsements as well as all of said renewals including the last renewal, were solely in reliance upon the aforesaid oral understanding of the bank, and in reliance upon the aforesaid oral understanding of the bank and in reliance upon the aforesaid representations of the bank through said assistant cashier, as to the purposes and manner of payment of the note. All payments of principal and interest mentioned in these findings were likewise made solely upon such reliance. Defendant Kelley, Glover & Vale, Inc., was at all times ready to perform its part of said understanding but said bank failed to perform its part as aforesaid, and it closed in Janu-

ary, 1932 without having performed its part. Neither did its Receiver ever perform subsequent to closing."

It seems to be clear from the pleadings and by the eighth finding of fact, that at the time the note herein sued upon was originally given, and when the same was renewed from time to time, it was the common understanding that the makers of said note were to pay the same only in accordance with the oral agreement; namely, that said note was to be paid out of the proceeds of the new loan which was to be obtained by the bank. That was their obligation under the contract.

In *Flippen* v. *Abbey* (1933), 135 Cal. App. 666, 27 P. (2d) 792, we find facts very similar to the facts here presented and, in my judgment, announces the principle that controls the decision of this case. In the California case, one Primus executed a note to himself and on the said same date endorsed it to one Hilton with an agreement with Hilton that he, Hilton, should purchase from one Mahan 100,000 shares of stock in a mining corporation at twenty-five cents per share, which stock Hilton was to resell and trade at $1.00 per share. Hilton was to sell the note and use the proceeds in furthering a campaign for the sale of the stock so purchased. Hilton, endorsee of the note, agreed to pay said note from the first proceeds received from the sale of this stock and then to return the note to Primus. It was also agreed that all profits arising from the sale of the stock should be divided between the two. The note was to be payable on or before six months with interest at eight per cent per annum. The note was sold by Hilton and various transfers of said note were made, and it finally came into the hands of the plaintiff in the action. It appears that plaintiff purchased said note after maturity and with full notice of the agreement

between Primus and Hilton. There were no profits from the purchase and sale of the stock, and consequently, no fund was accumulated out of which said note was to be paid in accordance with the agreement. Primus died the following year and the holder of the note brought suit against the estate. The court in deciding the question uses the following language:

> "While the record shows that the court erroneously struck out this testimony and also erred in shutting out considerable other evidence offered by the respondent, we think it sufficiently discloses a defense to the note as against Hilton. So long as he was the owner of the note he was bound by his agreement that it was not to be paid by the maker but was to be paid by him from the proceeds of certain stock which he was to buy and sell, and was by him to be returned to the maker. It appears that this was not done and that Hilton himself could not recover as against the maker and the appellant is in no better position since he bought the note from him after maturity and in fact with notice."

The same rule of law is again stated in the case of *Stern* v. *Frank* (1939), 35 Cal. App. (2d) 676, 680, 96 P. (2d) 802, wherein the following language is used:

> "The maker of a note is not liable where the note is payable out of a certain fund which fund never comes into existence."

So far as my investigation has revealed, we have found no case that holds to a different rule of law than that above stated. I think the principle sound and good law. Applying this principle of law to the case at bar, I think it furnishes a complete and sufficient answer. The court found specifically and definitely that when the note was executed by the appellants and delivered to the bank, it was clearly and definitely understood that said note was to be paid by the bank out of a

certain fund, namely, the proceeds of the new loan and not otherwise. It was definitely alleged in the pleadings and found by the court, that the bank did not fulfill its agreement and did not secure said fund from a new money lender, that said fund has never come into existence, and also found that the appellants were at all times able, willing and ready to fulfill and carry out all of the terms of the contract by them to be performed.

In my judgment, this contract is binding upon the bank and the receiver is in no better position than the bank itself, and for this reason I think the judgment should be reversed.

NOTE.—Reported in 44 N. E. (2d) 981.